1
2
3
4
5
6
7

8          **UNITED STATES DISTRICT COURT**

9          **EASTERN DISTRICT OF CALIFORNIA**

10

11   APRIL TAYLOR,                          )   Case No.: 1:14-cv-01033 - JLT
                                            )
12              Plaintiff,                  )   ORDER DIRECTING ENTRY OF JUDGMENT IN
                                            )   FAVOR OF DEFENDANT CAROLYN COLVIN,
13        v.                                )   ACTING COMMISSIONER OF SOCIAL
                                            )   SECURITY, AND AGAINST APRIL TAYLOR
14   CAROLYN W. COLVIN,                     )
     Acting Commissioner of Social Security,)
15                                          )
                Defendant.                  )
16   _____)

17          Plaintiff April Taylor asserts she is entitled a period of disability and disability insurance

18   benefits under Title II of the Social Security Act.  Plaintiff argues the administrative law judge erred in

19   evaluating the medical record, by rejecting a lay witness statement, and by finding her subjective

20   complaint lacked credibility.  Because the ALJ applied the proper legal standards and substantial

21   evidence supports the determination, the administrative decision is **AFFIRMED**.

22                              **BACKGROUND**

23          On August 11, 2010, Plaintiff filed an application for benefits, in which she alleged disability

24   beginning May 19, 2010. (Doc. 11-3 at 28)  The Social Security Administration denied the applications

25   at the initial level on April 1, 2011, and upon reconsideration on October 19, 2011.  (*Id.*; Doc. 11-5 at

26   2-6, 14-18)  Plaintiff requested a hearing, and testified before an ALJ on April 18, 2012.  (*Id.* at 28, 52)

27   The ALJ determined Plaintiff was not disabled under the Social Security Act, and issued an order

28   denying benefits on May 18, 2011.  (*Id.* at 17-26)  Plaintiff filed a request for review of the decision

1   with the Appeals Council, which denied the request on January 17, 2014.  (*Id.* at 2-4)  Therefore, the

2   ALJ's determination became the final decision of the Commissioner of Social Security.

3   ## STANDARD OF REVIEW

4          District courts have a limited scope of judicial review for disability claims after a decision by

5   the Commissioner to deny benefits under the Social Security Act.  When reviewing findings of fact,

6   such as whether a claimant was disabled, the Court must determine whether the Commissioner's

7   decision is supported by substantial evidence or is based on legal error.  42 U.S.C. § 405(g).  The ALJ's

8   determination that the claimant is not disabled must be upheld by the Court if the proper legal standards

9   were applied and the findings are supported by substantial evidence.  *See Sanchez v. Sec'y of Health &*

10  *Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

11         Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a

12  reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S.

13  389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)).  The record as a whole

14  must be considered, because "[t]he court must consider both evidence that supports and evidence that

15  detracts from the ALJ's conclusion."  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

16  ## DISABILITY BENEFITS

17         To qualify for benefits under the Social Security Act, Plaintiff must establish she is unable to

18  engage in substantial gainful activity due to a medically determinable physical or mental impairment

19  that has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C.

20  § 1382c(a)(3)(A).  An individual shall be considered to have a disability only if:

21         his physical or mental impairment or impairments are of such severity that he is not only
        unable to do his previous work, but cannot, considering his age, education, and work
22         experience, engage in any other kind of substantial gainful work which exists in the
        national economy, regardless of whether such work exists in the immediate area in
23         which he lives, or whether a specific job vacancy exists for him, or whether he would be
        hired if he applied for work.

24

25  42 U.S.C. § 1382c(a)(3)(B).  The burden of proof is on a claimant to establish disability.  *Terry v.*

26  *Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).  If a claimant establishes a prima facie case of disability,

27  the burden shifts to the Commissioner to prove the claimant is able to engage in other substantial

28  gainful employment.  *Maounis v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

2

**ADMINISTRATIVE DETERMINATION**

To achieve uniform decisions, the Commissioner established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 404.1520, 416.920(a)-(f). The process requires the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the period of alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity to perform to past relevant work or (5) the ability to perform other work existing in significant numbers at the state and national level. *Id.* The ALJ must consider testimonial and objective medical evidence. 20 C.F.R. §§ 404.1527, 416.927.

**A.     Medical Records**

In March 2010, Plaintiff went to Dr. Jong Moon to request a prescription of Wellbutrin to help her stop smoking. (Doc. 11-9 at 16) In addition, Plaintiff received an epidural steroid injection that targeted the left L4 nerve. (Doc. 11-10 at 66)

In April and May 2010, Plaintiff reported she had been coughing; having hot flashes, chills, night sweats, and dizzy spells; and her blood pressure was "going up and down." (Doc. 11-9 at 15-16) In addition, on May 4, 2010, Plaintiff reported she had "pressure on [her] chest" and felt a burning in her throat. (*Id.*) She was diagnosed with bronchitis, and Dr. Moon noted Plaintiff was going through menopause. (*Id.* at 15)

On May 24, 2010, Plaintiff went to the emergency room, where she reported having "chest pain for two weeks on and off" that she described as a "10/10." (Doc. 11-8 at 2) Dr. Denver Chao noted Plaintiff described the pain as "radiating to her jaw and down her left arm." (Doc. 11-9 at 5) She also reported having "multiple episodes of chest pain with minor exertion." (*Id.*) Plaintiff was admitted to Kern Medical Center, where she was diagnosed with acute coronary syndrome and dyslipidemia. (Doc. 11-8 at 2) Plaintiff had a "[b]enign physical examination," but was admitted after being "started on ACS protocol with Lovenox, metoprolo, and lisinopril." (*Id.*) The next day, she was transferred to Memorial Hospital "to have cardiac catheterization and a possible CABG." (*Id.*)

Plaintiff was given a coronary artery stent implant, after which the cardiologist gave her "an excuse for 5 weeks off from work." (Doc. 11-9 at 10) On June 30, 2010, Plaintiff went to Dr. Jong

Moon, "complaining of problems with chest, and feeling very tired." (*Id.*)  Dr. Moon noted Plaintiff was "unable to get an appointment with [a] cardiologist until 9/9/2010," and he "took [Plaintiff] off work due to post traumatic stress disorder and chronic fatigue syndrome related to procedure." (*Id.*)  Dr. Moon gave Plaintiff a note "to go back to work on 9/16/10." (*Id.*; *see also id.* at 13)

Plaintiff went to the Spine and Orthopedic Center in September 2010, where she was evaluated by Dr. Alex Moelleken. (Doc. 11-11 at 4)  Plaintiff reported she had low back pain," which she "rate[d] at 10/10 on the pain scale." (*Id.*)  She also said she had pain in her left leg down to her knee. (*Id.*)  Dr. Moelleken observed that Plaintiff walked with a "slow and antalgic" gait. (*Id.*)  He determined Plaintiff had a decreased range of motion in her lumbar spine, and decreased sensation at the L4, L5, and S1 levels. (*Id.*)  Dr. Moelleken diagnosed Plaintiff with degenerative disc disease of the lumbar spine with radiculopathy; "L3 spondyolysis/pars defect with L3-L4 slip;" and "[p]otential psychological issues including sleep disorder, depression, and coping issues." (*Id.*)  Dr. Moelleken discussed the possibility of an epidural steroid injection, but noted it would be held off until her cardiologist cleared her for the procedure. (*Id.*)

In October 2010, Plaintiff continued to report that her back pain was a "10/10 on the pain scale." (Doc. 11-11 at 2)  On October 13, Plaintiff told Dr. Moon that she had a "fever off & on," and had been sweating a lot. (Doc. 11-9 at 13)  She reported also that her joints were "stiff & swollen," and she was feeling dizzy. (*Id.*)  Dr. Moon diagnosed Plaintiff with vertigo and arthritis. (*Id.*)

On November 10, 2010, Plaintiff had a transthoracic echocardiogram. (Doc. 11-9 at 3-4)  Her left and right ventricles were "normal in size," with "normal left ventricular wall thickness." (*Id.* at 3)  In addition, her left atrial size was normal, and there was "no evidence of stenosis, fluttering, or prolapse" in her mitral valve. (*Id.*)  Plaintiff's aortic valve was "normal in structure and function." (*Id.*)

In December 2010, Plaintiff told Dr. Moelleken that "she was recently told 'it will be at least June of 2011 before you could have the [epidural] injection." (Doc. 11-10 at 26)  Dr. Moelleken determined Plaintiff's "[r]ange of motion of lumbar spine [was] decreased in all planes," and she had "[d]ecrease sensation L4, L5 and S1 dermatomes on the left." (*Id.*)  In addition, Dr. Moelleken  found Plaintiff's "[m]otor exam, tibialis anterior, eversion, and inversion [were] 4+/5 on [the] left." (*Id.*)  Plaintiff continued to have decreased range of motion and sensation in January 2011. (*Id.* at 23)

4

1    Dr. James McNairn performed a comprehensive psychiatric evaluation on February 26, 2011.

2    (Doc. 11-9 at 26)  Plaintiff "reported depression, anxiety, low energy, frequent crying, social

3    withdrawal and distrust and avoidance of people." (*Id.*)  She told Dr. McNairn the symptoms had

4    started three years ago, and "attributed her current mood problems to physical health problems, a back

5    injury." (*Id.* at 27)  She reported that she occasionally went shopping and ran errands, and she did "not

6    require assistance with bathing, dressing, feeding, or personal hygiene." (*Id.* at 28)  Also, Plaintiff said

7    she did not have "close friends at this time, claiming she distrusts people based on past relationship

8    problems." (*Id.*)  Dr. McNairn observed that Plaintiff "was cooperative and pleasant throughout the

9    evaluation" and her "[t]hought processes were organized and logical." (*Id.* at 29)  He determined

10   Plaintiff was "able to follow simple and short instructions," though her recent memory was "[m]ildy

11   impaired, based on her ability to recall 2/3 words after five minutes." (*Id.*)  Dr. McNairn diagnosed

12   Plaintiff with "Depressive Disorder, [Not Otherwise Specified]." (*Id.* at 30)  He concluded:

13
14   > The claimant's ability to perform simple and repetitive tasks is not impaired.  The claimant's ability to perform complex and detailed tasks is mildly impaired.  The claimant's ability to accept instructions from a supervisor and interact appropriately with co-workers and the public is mildly to moderately impaired.

15

16   (*Id.*)  In addition, he opined Plaintiff's "ability to maintain regular work attendance and complete a

17   normal workday/workweek without interruption from a psychological problem is mildly to moderately

18   impaired." (*Id.*)  Dr. McNairn believed Plaintiff's problems were "treatable" and that "[s]he would

19   benefit from mental health intervention, both counseling and psychiatric medications." (*Id.* at 31)

20   On March 9, 2011, Dr. Ralph Robinowitz completed a mental residual functional capacity

21   assessment and psychiatric review. (Doc. 11-9 at 32-43)  Dr. Robinowitz noted Plaintiff was "able to

22   complete her daily activities of living without assistance from a 3rd- party." (*Id.* at 42)  Also, he

23   observed that Plaintiff was not taking medication or receiving treatment for a mental health condition.

24   (*Id.*)  Dr. Robinowitz concluded Plaintiff had mild restrictions with her activities of daily living; mild

25   difficulties in maintaining social functioning; mild difficulties in maintaining concentration,

26   persistence, or pace; and no episodes of decompensation. (*Id.* at 40)  Accordingly, he opined Plaintiff's

27   mental impairment was "non-severe." (*Id.* at 42)

28   On March 15, 2011, Plaintiff had a pharmacologic stress myocardial perfusion test, to determine

5

Plaintiff had myocardial ischemia.  (Doc. 11-9 at 61)  Dr. Javed Syed determined Plaintiff's left

ventricle size and wall motion were normal.  (*Id.*)  Dr. Syed found "mild thinning of the anterior septal

wall" and "mild fixed perfusion defect of the anterior septal wall."  (*Id.* at 62)  Dr. Syed concluded

"[n]o myocardial ischemia [was] seen."  (*Id.*)

Dr. Emanuel Dozier completed an internal medicine evaluation on March 29, 2011.  (Doc. 11-9

at 44-48)  He noted Plaintiff had been treated for coronary artery disease, and had suffered from a

myocardial infarction.  (*Id.* at 44)  Plaintiff reported she had "ongoing episodes of chest pain that occur

at least 2-3 times per week," which was "atypical" and occurred "both at rest and on exertion."  (*Id.*)

Plaintiff also said she had "swelling in both lower extremities every-other day [and] dyspnea on

exertion at half-block."  (*Id.*)  According to Dr. Dozier, Plaintiff reported:

> She has a history of chronic low back pain since 2004.  She had a disc herniation at that
> time, and underwent a laminectomy.  She ha[d] some brief period of improvement in her
> back, until she had a slip-fall accident in 2007.  Since that time, the back pain has
> returned with radiation down the left lower extremity.  She has numbness in the left foot
> that is permanent.  She has tingling and weakness in that same leg.  She has had several
> rounds of epidurals with no significant improvement.
>
> She has limitations on standing to 10 minutes, sitting 20 minutes, walking a half-block,
> and lifting to a gallon of milk.  Bending, twisting, and stooping aggravate it.  She has
> 9/10 pain for which she takes medication and gets very poor relief.

(*Id.* at 45)  Further, Plaintiff told Dr. Dozier that she was "unable to do house chores, but [was] able to

dress herself."  (*Id.*)

Dr. Dozier observed that Plaintiff walked down the hall "with a normal steppage gait," and

without showing "signs of pain, ataxia or shortness of breath."  (Doc. 11-9 at 45)  He found Plaintiff's

motor strength was "5/5 in the upper and lower extremities bilaterally," and her grip strength was "5/5

bilaterally."  (*Id.* at 47)  In addition, he determined that Plaintiff had a "loss of the normal cervical

lordotic curve" in her back, "with paravertebral muscle spasms, local tenderness, and positive straight

leg raising in the left lower extremity in the supine position."  (*Id.* at 46)  Further, on the sensory exam

he found Plaintiff had a "[d]iminished pinprick and vibration of the lower extremity at L5-S1

distribution."  (*Id.* at 48)  According to Dr. Dozier, Plaintiff could stand and walk a maximum of

"[f]our hours in an eight-hour day" and sit a maximum of "[f]our hours in an eight-hour day" due to the

impairment with her back.  (*Id.*)  Dr. Dozier also opined Plaintiff was able to lift and carry "20 pounds

occasionally, 10 pounds frequently." (*Id.*)  He concluded Plaintiff did not have any manipulative limitations, but was limited to "[o]ccasional bending, stooping, crouching, pushing, and pulling." (*Id.*)

Dr. Karen Schnute reviewed the record and completed a physical residual functional capacity assessment on March 31, 2011. (Doc. 11-9 at 49-55)  Dr. Schnute gave "[m]oderate" weight to the opinion of Dr. Dozier, and concluded Plaintiff was able to lift and carry 20 pounds occasionally and 10 pounds frequently; push and pull without limitation; stand and/or walk at least two hours in an eight-hour day; and sit about six hours in an eight-hour day. (*Id.* at 50, 54)  Dr. Schnute believed also that Plaintiff could frequently balance and climb ramps and stairs; occasionally stoop, kneel, crouch, and crawl; and never climb ladders, ropes, and scaffolds. (*Id.* at 52)

On March 31, 2011, Plaintiff visited Kern Medical Center for a follow-appointment. (Doc. 11-9 at 57) Plaintiff reported she continued to have pain "in the center of her chest" about three to four times daily. (*Id.*)  She described the pain "as achy" and "5/10 in severity," but said it was not "getting any worse." (*Id.*)  Plaintiff also said she had "stabbing [pain] in her temple" for three weeks. (*Id.*)  The attending physician found "no cardiac symptoms." (*Id.* at 58)  However, the physician noted Plaintiff was still smoking, which was a risk factor, and advised Plaintiff regarding "smoking cessation." (*Id.*)

Plaintiff returned to the Spine and Orthopedic Center in April, May and June 2011, complaining of pain in her lower back that she "rate[d] at 10/10 on the pain scale." (Doc. 11-10 at 2, 6, 11)  Dr. Moelleken noted:

> She continues to have left lower extremity numbness, tingling as well as achiness, which extends to the foot.  She notes her symptoms have been increased with time.  She notes activity level is decreased.  She notes she can only walk five minutes[;] before she was able to walk 20 minutes.  She states that this has been increasing over the past three months.  In regards to medications, she is taking Norco four to six per day, lorazepam one and a half per day, Lexeril three per day, and utilizing the Motrin.  She states these help decrease her pain as well as increase her function.  However, she does note medications are not decreasing her pain significantly.  She denies any side effects.

(*Id.* at 2)  He observed that Plaintiff's gait was "slow and antalgic," and she had a reduced range of motion in her lumbar spine. (*Id.*)  Plaintiff had an electromyography, which Dr. Moelleken noted was abnormal and incomplete, but "may suggest chronic left L4-5 radiculopathy." (*Id.; see also id.* at 54)  Dr. Moelleken diagnosed Plaintiff with degenerative disc disease of the lumbar spine with radiculopathy; "L3 spondyloloysis/ pars defect with L3-L4 slip;" "[p]ossible lumbar radiculopathy;"

1   and "[p]otential psychological issues including sleep disorder, depression, and coping issues." (*Id.*) He

2   requested authorization of an MRI and an extension of a previously-approved epidural steroid injection.

3   (*Id.* at 3)

4          Dr. Keith Quint reviewed the medical record for a case analysis on August 23, 2011. (*See* Doc.

5   11-10 at 61-64) He opined that the "initial decision as appropriate" and adopted the initial residual

6   functional capacity offered by Dr. Schnute. (*Id.* at 64)

7          On August 29, 2011, Dr. Bilik reviewed the record related to Plaintiff's mental impairments.

8   (*See* Doc. 11-10 at 61-64) Dr. Bilik noted Plaintiff "appears to allege worsening severity of mental

9   impairments on appeal, but none appears evidence in the [medical record] received subsequent to the

10  initial determination." (*Id.* at 64-65) Dr. Bilik affirmed the determination that Plaintiff's mental

11  impairments were not severe. (*Id.* at 65)

12         In November 2011, Plaintiff continued to report pain that was "10/10," stating she had "six

13  sessions of acupuncture, with no relief, and 12 sessions of physical therapy, which 'aggravate[d] [her]

14  pain.'" (Doc. 11-11 at 22) She requested a prescription for OxyContin, saying she had taken it "from a

15  'outside source' and it did help her pain." (*Id.*)

16         Dr. Moelleken referred Plaintiff to a pain management clinic, where Dr. Perish Vaidya

17  evaluated Plaintiff on December 1, 2011. (Doc. 11-11 at 19-21, 23) Plaintiff reported her pain was a

18  "9 to 10/10 in severity," and said her medication was no longer helping relieve the pain. (*Id.* at 19)

19  She admitted that "she tried her husband's OxyContin 20 mg, which reduced her pain to 3/10 in

20  severity." (*Id.* at 20) Dr. Vaidya found Plaintiff "had global decreased range of motion of the lumbar

21  spine limited by pain," as well as "decreased manual muscle testing along the left compared to the right

22  lower extremity globally at 4+/5 compared to 5/5 on the right." (*Id.*) In addition, Dr. Vaidya

23  determined Plaintiff had "[p]ositive paresthesias along the left L3 through S1 dermatomal distribution

24  compared to the right." (*Id.*)

25         Plaintiff had an MRI on her lumbar spine on December 12, 2011. (Doc. 11-11 at 12) Dr. Sonja

26  O'Brien determined Plaintiff had degenerative disc disease, which was "most pronounced at L3

27  through L5 consisting of disk dehydration, disk height loss, anterior spondylosis and end plate marrow

28  change, with marked edema at these levels." (*Id.*) In addition, Dr. O'Briein found Plaintiff had canal

stenosis at the L4-5 level and "neural foraminal narrowing includ[ing] L3-4 mild-to-moderate left, severe right and L4-5 severe left, moderate-to-severe right neural foraminal narrowing." (*Id.* at 13, emphasis omitted)

In January 2012, Plaintiff reported that the oxycodone prescribed by Dr. Vaidya "caused severe nausea and vomiting." (Doc. 11-11 at 14)  Dr. Vaidya observed that Plaintiff "appeared obviously uncomfortable," and walked with a slow gait.  (*Id.*)  Also, Dr. Vaidya determined Plaintiff continued to have "decreased range of motion" in the lumbar spine.  (*Id.*)

**B.     Administrative Hearing Testimony**

Plaintiff testified at the hearing before the ALJ on April 2012.  In addition, the ALJ called medical experts and a vocational expert to give testimony regarding Plaintiff's limitations and ability to work in the national economy.

1.     Plaintiff

Plaintiff testified that she "quit working because [she] was having problems" on May, 19, 2010. (Doc. 11-3 at 64)  However, Plaintiff also stated that she was "fired" from her position as a transit driver for the City of Shafter "[r]ight after they found out [she] had the heart attack," which occurred on May 26, 2010.  (Doc. 11-3 at 64-65)  The ALJ questioned Plaintiff regarding the conflicting statements, and she explained that she left work on May 19 because she "started having chest pains," but she remained employed officially.  (*Id.* at 66)  Plaintiff clarified she was fired on August 10, 2010, because the City "wanted [her] to come back and the doctor said [she] wasn't ready to go back to work at that time and they didn't like that."  (*Id.*)

Plaintiff testified that her heart gave her "a lot of problems" and her chest ached "constantly" if she walked too much or did anything.  (Doc. 11-3 at 55)  She explained her chest felt "like it's being squeezed."  (*Id.*)  Plaintiff reported she saw a cardiologist "[o]nce a year," and when she last saw him, she was told her heart "was fine."  (*Id.* at 56)  Plaintiff said, "I just think there's something there that they're not finding."  (*Id.*)

She reported she had "[d]aily swelling" in her fingers and feet, for which she took Lasix.  (Doc. 11-3 at 56-57)  Plaintiff said the medication helped the swelling, but "[o]nce or twice" in a thirty-day period, it would not work.  (*Id.* at 57, 77)  She estimated that she elevated her feet to reduce the

swelling about "[o]nce a week," for about thirty minutes.  (*Id.* at 57, 78)

Plaintiff said she continued to have low back problems despite a prior laminectomy.  (Doc. 11-3 at 58-59)  She explained she fell and reinjured her back in 2007, and had problems with "several levels" in her lumbar spine.  (*Id.* at 59-60, 76)  She reported her physicians told her she "need[ed] surgery again," but she did not know what surgical procedure the doctors wanted to do.  (*Id.*)  Plaintiff said they were trying injections, but she was unable to receive more injections due to taking Plavix and aspirin for her heart. (*Id.* at 60)

She reported she had posttraumatic stress disorder related to a heart attack she suffered, and that she suffered from depression, which she attributed to her second back injury.  (Doc. 11-3 at 62-63)  In addition, Plaintiff said she did not trust people for "the last couple of years," including her family.  (*Id.* at 62-63)  Plaintiff confirmed that she thought her depression and anxiety were related to her physical problems.  (*Id.* at 67)  She testified that she was not receiving treatment or taking any medications for a mental health condition.  (*Id.* at 68-69)

Plaintiff said she walked "[a]s little as possible," because walking "cause[d] a lot of problems with [her] back."  (Doc. 11-3 at 70)  She explained the pain went down her left leg and caused difficulty with walking normally.  (*Id.*)  When asked the longest she could "walk right now without stopping," Plaintiff responded that she had walked walk from the parking lot to the hearing office, and it took "[m]aybe three to four minutes."  (*Id.* at 82)

She testified she was still smoking "[a] little over a half a pack a day."  (Doc. 11-3 at 71)  Plaintiff acknowledged that her cardiologist told her to stop smoking after her heart attack, and "he wanted it in like six months."  (*Id.*)  Plaintiff said she was able cut back from one pack per day to a half a pack for two years, but she did not quit smoking.  (*Id.*)  She reported she "ran out of the Wellbutrin" to help her stop smoking, and she could not get it refilled.  (*Id.* at 72)  She said she knew patches were an option and the phone number to call, but explained she had not done so because she did not have a phone and it was "just a long process."  (*Id.* at 81)

Plaintiff said she spent a typical day in her room, watching television.  (Doc. 11-3 at 83)  She reported, "I lay down on my left side with my legs outstretched and I have to constantly, every five or ten minutes, change position because of the pain."  (*Id.*) Plaintiff testified that she "occasionally" did

dishes and laundry, but not from start to finish.  (*Id.* at 83-84)  She explained it was "just hard to do it" and she was unable to bend over and reach to "get stuff out of the dryer" without help from her daughters.  (*Id.* at 83)  Plaintiff said her daughters, who were 25 and 29, assisted with "the housework, the vacuuming, sweeping, [and] mopping."  (*Id.* at 84)

### 2.       Dr. Michael Landau

Dr. Landau, an internist and cardiologist, reviewed Plaintiff's medical records and testified she had "ischemic heart disease."  (Doc. 11-3 at 85)  He also noted Plaintiff "had an anteroseptal myocardial infarction treated with percutaneous intervention in May of 2010," although that was "all history" and he had no records of the procedure.  (*Id.*)  Further, Dr. Landau reported Plaintiff was obese and had "degenerative disease with degenerative arthritis of the lumbosacral spine with persistent low back pain despite discectomy in 2004."  (*Id.* at 86)

Dr. Landau opined that Plaintiff had "retained left ventricular function and atypical chest pain." (Doc. 11-3 at 85)  He explained, "The severity of the condition would be New York Heart Association Class I to II, indicating either no heart symptoms or symptoms on normal activities."  (*Id.*)  However, he was not certain which class "without the follow up."  (*Id.*)  Also, Dr. Landau determined "the therapeutic classification would be B to C, indicating restrictions – B restrictions would be vigorous physical activities such as competitive athletics and C would be restrictions to normal activities."  (*Id.*) He "found no objective evidence of congestive heart failure."  (*Id.* at 86)

According to Dr. Landau, there was no medical evidence that showed Plaintiff's chest pain was due to a cardiac condition.  (Doc. 11-3 at 86)  He explained that Plaintiff had a stress perfusion test in March 2011 "because she was continuing to have what was described as atypical chest pain."  (*Id.* at 86-87)  Dr. Landau observed that the test "showed normal ejection fraction and a fixed anteroseptal defect consistent with the old heart attack that she had that was treated."  (*Id.* at 87)  Thus, he said there was "no evidence" that Plaintiff had "residual ischemia" as of the hearing date.  (*Id.*)

In addition, Dr. Landau observed the treatment notes indicated Plaintiff's gait was "slow and antalgic and she ha[d] decreased range of motion of the spine."  (Doc. 11-3 at 88)  Dr. Landau testified that Plaintiff had an electrodiagnostic study in June 2011, which "showed evidence that may be suggestive of chronic L4/5 radiculopathy" but "it wasn't a certain diagnosis."  (*Id.*)  He explained that

11

1   chronic radiculopathy "wouldn't be unusual" because Plaintiff had a laminectomy and "it's more

2   common than not to have evidence of … chronic abnormalities in nerve function after a surgical

3   procedure of that nature." (*Id.* at 89)  Dr. Landau said an MRI "show[ed] degenerative disc disease and

4   degenerative arthritis with mild to moderate canal stenosis and neuroforamenal encroachment." (*Id.*)

5   Dr. Landau reported the physicians were treating Plaintiff's symptoms "with pain management," and

6   there was no indication in the record that Plaintiff needed surgery. (*Id.*)

7        Plaintiff's counsel asked Dr. Landau whether "a combination of severe neuroforamenal

8   narrowing with moderate canal stenosis [was] enough to warrant back surgery." (Doc. 11-3 at 92)  In

9   response, Dr. Landau said there was "no yes or no answer" because it "would depend on the thinking of

10  the particular surgeon in consultation with the… patient." (*Id.*)  He explained:

11        [T]here are clear indicates for surgery.  For example, a loss of bladder or bowel control,
          atrophy of muscles, a foot drop, things of that nature that clearly define, that you can
12        clearly find evidence of.  But if the only indication is pain, then you're going to find some
          surgeons who will operate in an attempt to relieve pain and some who won't, so I really
13        can't give you – I can't tell you [what] her doctors would want to do in that situation.  It
          depends on the doctor and it depends on her.  Some patients will say, yeah.  If it's just for
14        pain, I'm not going, I'm not going to undergo because it's not likely to help.  But some
          doctors will do it anyway because sometimes it does help.

15

16  (*Id.* at 92-93)

17        Further, Dr. Landau explained pain could affect a person's residual functional capacity because

18  "if she has 10 out of 10 pain all the time, then she's clearly not functional because she would be

19  screaming in pain." (Doc. 11-3 at 93)  He opined that with "anything less than that, it's very difficult to

20  know whether that would sharpen her concentration or diminish her concentration." (*Id.*)  According to

21  Dr. Landau, with prescription Percocets and other narcotics such as those taken by Plaintiff, he was

22  unable to say for sure whether it would interfere with Plaintiff's ability to function because factors such

23  as how much she takes, how frequently, how long, and "how used to it she has become" must be

24  considered. (*Id.* at 94)

25        Dr. Landau testified that based upon his review of the record, he "would limit standing and

26  walking to one hour out of eight, 15 to 20 minutes at a time." (Doc. 11-3 at 94)  He opined Plaintiff

27  "may use a cane for [walking] distances greater than one block." (*Id.* at 95)  Also, Dr. Landau believed

28  Plaintiff had "no  limitations to sitting with normal breaks such as every two hours and she should have

the provision to stand and stretch as needed," which he estimated may be required "one to three minutes an hour." (*Id.*)  Dr. Landau believed that Plaintiff could lift and carry "10 pounds frequently and occasionally;" and stoop, bend, and climb stairs occasionally.  (*Id.*)  He concluded Plaintiff could not "climb ladders, work at heights or balance" or "squat, kneel, crawl, run, or jump." (*Id.*)

### 3.      Dr. Shakil Mohammed

Dr. Mohammed, a psychiatric medical expert, testified that although Plaintiff was not receiving any mental health treatment, Wellbutrin "does have [an] antidepressant effect." (Doc. 11-3 at 97)  Dr. Mohammed testified that based upon his review of the medical record, Plaintiff had "depressive disorder, [not otherwise specified]." (*Id.*)

According to Dr. Mohammed, Plaintiff had mild limitations with her activities of daily living; mild limitations with social functioning; and mild limitations with concentration, persistence, and pace. (Doc. 11-3 at 97)  He believed that Plaintiff was able to "do a task requiring simple instructions and detailed but not complex instructions." (*Id.* at 98)  In addition, Dr. Mohammed testified that Plaintiff could "have frequent interaction with supervisors and coworkers and occasional [interaction] with [the] public." (*Id.*)  Dr. Mohammed believed that Plaintiff was able to handle normal work stress with her mental condition, "but because of the heart situation and atypical chest pain," she should be limited to "low stress" jobs that required few changes in the work or its setting.  (*Id.*)

### 4.      Linda Ferra

Vocational expert Linda Ferra (the "VE") classified Plaintiff's past relevant work as a bus driver, DOT 913.463-010.  (Doc. 11-3 at 100) The VE explained that as defined in the *Dictionary of Occupational Titles,* the job was "medium in exertion."[1]  (*Id.*)

The ALJ asked the VE to consider "a hypothetical person who has the same age, education, and experience as [Plaintiff] does." (Doc. 11-3 at 101)  The ALJ added:

> This hypothetical person would have the capacity to work at the sedentary exertional
> level which would include lifting and carrying up to 10 pounds frequently and 10 pounds
> occasionally and the use of both arms, if necessary; to stand and walk for a total of one

---

[1] The *Dictionary of Occupational Titles* ("*DOT*") by the United States Dept. of Labor, Employment & Training Admin., may be relied upon "in evaluating whether the claimant is able to perform work in the national economy." *Terry v. Sullivan*, 903 F.2d 1273, 1276 (9th Cir. 1990). The *DOT* classifies jobs by their exertional and skill requirements, and may be a primary source of information for the ALJ or Commissioner. 20 C.F.R. § 404.1566(d)(1).

out of eight hours during the workday and that would be in increments of approximately 15 to 20 minutes at one time.  Further, this hypothetical person, if they needed to walk for more than a block, would be allowed to use a cane if desired.  Sitting is unlimited with up to eight out of eight hours during a workday after, with normal breaks.  This sitting and standing and walking; however, would also require the opportunity for this hypothetical person to stand and stretch as needed for comfort and for a maximum duration of approximately one to three minutes per hour in the aggregate.  As far as postural [limitations] are concerned, this hypothetical person would have the capacity to occasionally stoop and bend as well as to climb stairs.  There would, however, be a preclusion from climbing ladders, ropes, or scaffolds, working at unprotected heights, balancing, squatting, kneeling, crawling as well as the non-postural limitations of running and jumping.  There are no other physical limitations.  And from a mental perspective, this hypothetical person would have the capacity for a range of work from simple repetitive through detailed work.  However, complex work would be precluded.  May have frequent contact with co-workers and supervisors but only occasional contact with the public.  Should have a[] low stress occupation defined as few changes in the work or its setting.

(*Id.* at 101)  The VE opined that with these limitations and abilities, the hypothetical individual would not be able to perform Plaintiff's past relevant work.  (*Id.* at 102)  After clarifying that the occasional public contact was limited to in person interactions "as opposed to telecommunication," the VE opined the hypothetical worker could perform other unskilled, sedentary work in the national economy.  (*Id.*)  As examples, the VE identified work as order clerk, *DOT* 209.576-014; nut sorter, *DOT* 521.687-086; and assembler, *DOT* 734.687-018.  (*Id.* at 102-03)

Next, Plaintiff's counsel asked the VE to consider an individual with the above limitations, but who also needed the option of sitting and standing "one to three minutes an hour" four days a week, and for fifteen minutes on the fifth day.  (Doc. 11-3 at 103-04)  The VE opined the number of jobs available to such a person would be reduced "by about 30 to 40 percent."  (*Id.* at 104-05)

Third, the VE considered an individual who—with the limitations identified by the ALJ—also "needed to elevate their legs heart height at work two or three times per month … [f]or a duration of 20 to 30 minutes at the worksite."  (Doc. 11-3 at 105)  The VE opined that if the elevation "had to be a break outside of normal breaks, it would not be tolerable" in the jobs identified, "because they are essentially production driven."  (*Id.*)  Further, VE explained a person could not be off-task for fifteen percent of a day, but being off task for "[f]ive percent is probably okay."  (*Id.* at 106-07)

**C.     Lay Witness Statement**

George Taylor, Plaintiff's husband, completed a third-party function report on August 22, 2011.  (Doc. 11-7 at 46)  He reported he spent 24 hours a day with Plaintiff.  (*Id.*)  According to Mr. Taylor,

14

1    during a typical day, Plaintiff "showers and lays around, goes to the doctor [and] takes pain pills."  (*Id.*)

2    He said Plaintiff "watches TV all day long off and on" and "reads at bed time."  (*Id.* at 50)  Mr. Taylor

3    noted that Plaintiff was "unable to concentrate on what she does, and wants to sleep all the time."  (*Id.*)

4    He reported Plaintiff was able to go out alone, and she went shopping for food and household items

5    about "once a month" for 1-2 hours.  (*Id.* at 49)

6         Mr. Taylor noted Plaintiff was "unable to sleep because her back keeps her from being able to

7    stay in one spot due to pain."  (Doc. 11-7 at 47)  He indicated Plaintiff did not have any difficulties with

8    personal care, but she had to have help with housework.  (*Id.* at 47-48)  Mr. Taylor said Plaintiff had

9    "to do a little at a time and … take breaks."  (*Id.* at 48)  He believed Plaintiff needed "to be reminded

10   that the work has to be done and encouraged" to do chores.  (*Id.*)  However, Mr. Taylor did not identify

11   any reasons why Plaintiff did not do house or yard work.  (*Id.* at 49)

12        According to Mr. Taylor, Plaintiff did not "want to really go any where [sic] or talk to anyone

13   because of her pain and depression."  (Doc. 11-7 at 51)  In addition, Mr. Taylor indicated Plaintiff's

14   conditions affected her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, complete

15   tasks, use her hands, concentrate, and get along with others.  (*Id.* at 51)  Mr. Taylor believed Plaintiff

16   was able to walk "[a]bout half a block" before needing to rest.  (*Id.*)

17   **D.    The ALJ's Findings**

18        Pursuant to the five-step process, the ALJ determined first that Plaintiff did not engage in

19   substantial activity after the alleged disability date of May 19, 2010.  (Doc. 11-3 at 30)  Second, the

20   ALJ found Plaintiff has the following severe impairments: "ischemic heart disease, treated with

21   percutaneous stent, now with heart class I-II and exertional class B-C; degenerative disc disease of the

22   lumbar spine, status post laminectomy; obesity; and depressive disorder, not otherwise specified."  (*Id.*)

23   At step three, the ALJ opined these impairments did not meet or medically equal a listed impairment.

24   (*Id.* at 31)  Next, the ALJ determined:

25        [T]he claimant has the residual functional capacity to perform sedentary work as defined
         in 20 CFR 404.1567(a) except lift and carry 10 pounds frequently and 10 occasionally,
26       with the use of both arms if necessary; stand and walk for a total of one hour out of an
         eight-hour workday in increments of 15-20 minutes at one time; may use a cane if
27       desired when walking more than one block; could sit eight hours out of an eight-hour
         workday with normal breaks; these positional limits are accompanied with the

28

opportunity to stand and stretch for comfort as needed for a maximum total duration of approximately one to three minutes per hour in the aggregate; occasionally stoop and bend and climb stairs; never climb ladders, ropes or scaffolds; no balancing, squatting, kneeling, crouching, crawling, jumping, or running; no work at unprotected heights; can perform the range of simple through detailed work but no complex work; frequent contact with supervisors and co-workers but no more than occasional contact in person public contact; low stress occupations, defined as one with few changes in the work or work setting.

(*Id.* at 31-32)

With this residual functional capacity, the ALJ determined that Plaintiff was not capable of performing her past work as a bus driver.  (Doc. 11-3 at 37)  However, the ALJ found Plaintiff was able to perform other "jobs that exist in significant numbers in the national economy," such as order clerk, nut sorter, and assembler. (*Id.* at 38)  Therefore, the ALJ concluded Plaintiff was not disabled as defined by the Social Security Act.  (*Id.* at 38-39)

**DISCUSSION AND ANALYSIS**

Plaintiff asserts the ALJ erred by finding she was not credible and by rejecting the statements made by Mr. Taylor.  (Doc. 19 at 15- 29)  In addition, Plaintiff contends the ALJ erred with the residual functional capacity determination by not addressing her chest pain, swelling in her feet, and ability to stay on task.  (*Id.* at 30-36)  Because these limitations were not included in the hypothetical question posed to the vocational expert, Plaintiff argues that the ALJ's decision at step five lacks the support of substantial evidence in the record.  (*Id.* at 36-38)

**A.     The ALJ's Credibility Determination**

When evaluating a claimant's credibility, an ALJ must determine first whether objective medical evidence shows an underlying impairment "which could reasonably be expected to produce the pain or other symptoms alleged."  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991)).  Next, if there is no evidence of malingering, the ALJ must make specific findings as to the claimant's credibility.  *Id.* at 1036.  In this case, the ALJ determined Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (Doc. 11-3 at 33) However, the ALJ found Plaintiff's "statements concerning the intensity, persistence, and limiting effects of [her] symptoms" were not entirely credible. (*Id.*)

1    The ALJ must base an adverse credibility determination on clear and convincing evidence

2    where there is no affirmative evidence of a claimant's malingering and "the record includes objective

3    medical evidence establishing that the claimant suffers from an impairment that could reasonably

4    produce the symptoms of which he complains." *Carmickle v. Comm'r of Soc. Sec. Admin.*, 533 F.3d

5    1155, 1160 (9th Cir. 2008). Factors the ALJ may consider include, but are not limited to: (1) the

6    claimant's reputation for truthfulness, (2) inconsistencies in testimony or between testimony and

7    conduct; (3) the claimant's daily activities, (4) an unexplained, or inadequately explained, failure to

8    seek treatment or follow a prescribed course of treatment and (5) testimony from physicians

9    concerning the nature, severity, and effect of the symptoms of which the claimant complains. *Fair v.*

10   *Bowen*, 885 F.2d 597, 603 (9th Cir. 1989); *see also Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th

11   Cir. 2002). To support an adverse credibility determination, the ALJ "must identify what testimony is

12   not credible and what evidence undermines the claimant's complaints." *Lester v. Chater*, 81 F.3d 821,

13   834 (9th Cir. 1996).

14         Here, the ALJ considered conflicts between Plaintiff's statements and her actions, the

15   treatment sought and received, her failure to quit smoking, her level of activity, and objective medical

16   evidence. (*See* Doc. 11-3 at 33-34) The Ninth Circuit has determined these may be relevant factors in

17   assessing the credibility of a claimant.

18         1.      Plaintiff's failure to quit smoking

19         The Regulations caution claimants that "[i]n order to get benefits, you must follow treatment

20   prescribed by your physician if this treatment can restore your ability to work." 20 C.F.R. §§

21   404.1530(a), 416.930(a). If a claimant fails to follow the prescribed treatment without an acceptable

22   reason, the Commissioner "will not find [the claimant] disabled." 20 C.F.R. §§ 404.1530(b),

23   416.930(b). Accordingly, the Ninth Circuit determined, "[A]n unexplained, or inadequately explained,

24   failure to . . . follow a prescribed course of treatment . . . can cast doubt on the sincerity of the

25   claimant's pain testimony." *Fair*, 885 F.2d at 603. Therefore, noncompliance with a prescribed course

26   of treatment is clear and convincing reason for finding a plaintiff's subjective complaints lack

27   credibility. *Id.; see also Bunnell*, 947 F.2d at 346. Here, the ALJ noted Plaintiff "reported a serious

28   heart problem but continues to smoke cigarettes despite repeated warnings by her physician to stop

17

1  smoking."  (Doc. 11-3 at 34)

2      Plaintiff asserts she "was candid in her testimony and admitted that it was difficult to stop

3  smoking by smoking one less per day (AR 70); and that she had cut down her smoking originally from

4  a pack a day to a half pack a day (AR 70); that she had used Wellbutrin to change her pattern of

5  smoking (AR 96, 348)."  (Doc. 19 at 23)  Therefore, Plaintiff argues the ALJ erred in considering her

6  failure to quit smoking because "[i]t is certainly possible that a claimant is so addicted to cigarettes

7  that they continue to smoke even in the face of debilitating illness."  (*Id*, citing *Bray v. Comm'r of Soc.*

8  *Sec. Admin.*, 554 F.3d 1219, 1227 (9th Cir. 2009))

9      In *Bray*, the ALJ noted the claimant "continued to smoke cigarettes up until one month before

10  her hearing, despite complaining of debilitating shortness of breath and acute chemical sensitivity."  *Id.*,

11  554 F.3d at 1227.  "The ALJ reasoned that if Bray's respiratory ailments were as severe as she claimed,

12  she would likely refrain from smoking."  *Id.*  The claimant argued the ALJ erred by considering her

13  failure to quit smoking as part of the credibility determination.  *Id.*, 554 F.3d at 1227.  The Ninth

14  Circuit observed, "It is certainly possible that Bray was so addicted to cigarettes that she continued

15  smoking even in the face of debilitating shortness of breath and acute chemical sensitivity."  *Id.*  The

16  Court declined to determine whether the ALJ erred in considering the failure to quit smoking because

17  "the ALJ presented four other independent bases for discounting Bray's testimony, and each finds

18  ample support in the record," explaining "the ALJ's reliance on Bray's continued smoking, even if

19  erroneous, amounts to harmless error."  *Id.*  However, the Court also concluded the plaintiff's failure to

20  quit smoking until shortly before her hearing date "belie[d] Bray's claim of debilitating respiratory

21  illness."  *Id.*  Similarly, here, Plaintiff's failure to quit smoking, despite being told do so by her

22  physicians, undermines the credibility of her complaints of debilitating chest and heart pain.

23      Moreover, courts throughout the Ninth Circuit have determined that smoking against medical

24  advice— particularly where a condition is aggravated by smoking—undermines the credibility of a

25  claimant's subjective complaints.  *See, e.g., Bybee v. Astrue*, 2011 WL 6703568 at *8 (E.D. Cal. Dec.

26  21, 2011) (finding that "[s]moking despite medical advice to quit is relevant to the credibility analysis,

27  as is evidence of successfully quitting smoking for significant periods"); *Broughton v. Astrue*, 2012

28  U.S. Dist. LEXIS 65227 (C.D. Cal. May 8, 2012) ("plaintiff's failure to follow to comply with the

18

advice to stop smoking arguably also constituted a legally sufficient reason on which the ALJ could properly rely in support of his adverse credibility determination"); *see also Wagnon v. Colvin*, 2016 U.S. Dist. LEXIS 10580 at *9-10 (D. Or. Jan. 28, 2016) (finding the ALJ properly determined the "plaintiff's non-compliance with medical advice to discontinue drinking alcohol and smoking tobacco undermined the credibility of his subjective complaints" where the plaintiff "acknowledged that he continued to smoke contrary to medical advice and despite his history of cardiovascular problems"). Here, the medical record reflects that Plaintiff was advised to quit smoking when she visited Kern Medical Center, complaining of chest pain.  (*See* Doc. 11-9 at 57)  In addition, Plaintiff admitted her cardiologist wanted her to quit smoking within six months, yet she continued to smoke two years later. (*See* Doc. 11-3 at 71)

        Plaintiff now asserts she "explained her inability to cease smoking" because she did not have a telephone.  (Doc. 19 at 24)  Specifically, at the hearing Plaintiff testified she had used Wellbutrin, but ran out and could not get it refilled.  (Doc. 11-3 at 72)  Plaintiff acknowledged that she could obtain patches and she knew a phone number to call, but reported she had not done so because she no longer had phone and it was "just a long process."  (*Id.* at 81)  However, Plaintiff failed to say when she stopped paying for phone service, or why she had not previously started the process since she continued smoking long after being advised to quit.  Further, her implied assertion that she could not afford to buy the smoking cessation patches is undermined by ongoing decision to use her money to buy cigarettes.  *See Kocher v. Colvin,* 2015 U.S. Dist. LEXIS 151786 at * 26 (D. Nev. Sept. 29, 2015) (finding a "discrepancy between plaintiff's apparent ability to afford to smoke a half pack of cigarettes each day, and the financial distress he alleged as a reason for not seeking treatment").  Accordingly, Plaintiff has not adequately explained her failure to comply with the medical advice to quit smoking, and this factor supports the ALJ's adverse credibility determination.

        2.      Inconsistency with exhibited ability

        The Ninth Circuit has determined an ALJ may rely upon inconsistencies with a claimant's "testimony and [her] own conduct" to support an adverse credibility determination. *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997); *see also Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996) (an ALJ may use "ordinary techniques of credibility evaluation" including inconsistent

statements "and other testimony by the claimant that appears less than candid").  Here, as part of the credibility determination, the ALJ noted that Plaintiff "was observed to be able to walk down [the] hall without pain, she had a normal gait, no shortness of breath or ataxia"— despite the fact Plaintiff testified her pain caused difficulty with walking normally. (Doc. 11-3 at 34, 70)

Plaintiff argues the ALJ erred in considering the observations of Dr. Dozier because "[t]here is no evidence as to the length of the hall or whether Ms. Taylor was using hands held to the side walls to assist her, or the length of time she took to do this task." (Doc. 19 at 25)  Plaintiff asserts the evidence cited by the ALJ does "not contradict Ms. Taylor's other statements, including a statement at the hearing which indicated she was able to walk from the parking lot to the hearing office in a period of 3-4 minutes." (*Id.*, citing AR 81)  Significantly, however, Plaintiff testified her pain caused difficulty with walking normally—which is contradicted by Dr. Dozier's observations of Plaintiff walking in the hallway "with a normal steppage gait" without showing "signs of pain, ataxia or shortness of breath." (*See* Doc. 11-9 at 45)

Furthermore, physicians frequently observe claimants walking as part of the consultative examination, in part to compare to the claimants' behavior in the examining room.  *See, e.g., Brackett v. Comm'r of Soc. Sec.*, 2010 U.S. Dist. LEXIS 103904 at *6 (E.D. Cal. Sept. 29, 2010) (the examining physician observed the claimant had "no difficulty walking down the hall to the examination room" despite the fact that in the examining room the plaintiff exhibited a limp); *Al-Abbaddy v. Colvin*, 2014 U.S. Dist. LEXIS 117237 at *11 (Dist. Az. Aug. 22, 2014) (the examining physician noted Plaintiff had a "slow gait with a very antalgic station" in the examining room, but observed him "walking down the hallway" "at a pretty good pace" and without difficulty with ambulation).  Consequently, an ALJ may consider a claimant's ability to walk down a hallway with a normal gait, despite testimony to the contrary.  *See, e.g., Raue v. Colvin*, 2015 U.S. Dist. LEXIS 118048 at *7, 18 (E.D. Cal. Sept. 3, 2015) (the examining physician observed that the claimant "had a normal gait" and "walked down the hall without pain," which the ALJ considered as part of the credibility determination); *Ideker v. Colvin*, 2013 U.S. Dist. LEXIS 112201 at *12 (C.D. Cal. Aug. 7, 2013) (as part of the credibility determination, the ALJ noted the claimant "was observed to walk down a hallway in the medical office in a very stable manner, moving quickly and promptly"); *see also Melendez v. Astrue*, 2013 U.S. Dist. LEXIS 42033 at

20

1   * 36 (C.D. Cal. Mar. 25, 2013) (considering the fact that the claimant "was observed walking in the

2   hallway without any problems, but she began to cry when the healthcare provider entered the room").

3          Accordingly, the ALJ properly considered Dr. Dozier's observation of Plaintiff's ability to walk

4   without difficulty, and this factor supports the adverse credibility determination.

5          3.      Conflicts with the medical record

6          In general, "conflicts between a [claimant's] testimony of subjective complaints and the

7   objective medical evidence in the record" can constitute "specific and substantial reasons that

8   undermine . . . credibility." *Morgan v. Comm'r of Social Sec. Admin.*, 169 F.3d 595, 600 (9th Cir.

9   1999). The Ninth Circuit explained, "While subjective pain testimony cannot be rejected on the sole

10  ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a

11  relevant factor in determining the severity of the claimant's pain and its disabling effects." *Rollins v.

12  Massanari*, 261 F.3d 853, 857 (9th Cir. 2001); *see also Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir.

13  2005) ("Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it

14  is a factor that the ALJ can consider in his credibility analysis").  Because the ALJ did not base the

15  decision solely on the fact that the medical record did not support the degree of symptoms alleged by

16  Plaintiff, the objective medical evidence was a relevant factor in determining Plaintiff's credibility.

17         However, if an ALJ cites the medical evidence as part of a credibility determination, it is not

18  sufficient for the ALJ to simply state that the testimony is contradicted by the record.  *Holohan v.

19  Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001) ("general findings are an insufficient basis to support

20  an adverse credibility determination").  Rather, an ALJ must "specifically identify what testimony is

21  credible and what evidence undermines the claimant's complaints." *Greger v. Barnhart*, 464 F.3d 968,

22  972 (9th Cir. 2006); *see also Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993) (an ALJ must identify

23  "what evidence suggests the complaints are not credible").

24         In this case, the ALJ noted Plaintiff "testified that her heart [was] giving her many problems,"

25  including aching and feeling "as though it [was] being squeezed."  (Doc. 11-3 at 32)  Plaintiff also

26  testified that "she needs another surgery since re-injuring her back after she fell."  (Doc. 11-3 at 32)

27  However, the ALJ noted Plaintiff was "unclear which surgery is needed," and there was no evidence in

28  the record of a recommendation for surgery.  (*Id.* at 34, 89)

21

The ALJ also found Plaintiff's report of chest pain and continuing heart problems was inconsistent with the medical record, because "her doctor has cleared her of having any heart condition." (Doc. 11-3 at 32) The ALJ observed: "The stress myocardial perfusion test showed no myocardial ischemia and normal ejection fraction," and Dr. Landau, a cardiologist, testified her "alleged chest pain and discomfort … [was] inconsistent with the stress myocardial perfusion test." (*Id.* at 34; *see also id.* at 35) Also, the ALJ noted Dr. Landau testified Plaintiff's heart had "an exertional capacity somewhere between vigorous activity and normal activities." (*Id.*) Finally, the ALJ observed that Dr. Landau found "no evidence" of congestive heart failure. (*Id.*)

Because the ALJ identified inconsistencies between the record and Plaintiff's testimony, the objective medical record supports the adverse credibility determination. *See Greger*, 464 F.3d at 972; *Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995) (an ALJ may consider "contradictions between claimant's testimony and the relevant medical evidence").

    4.    Level of activity

When a claimant spends a substantial part of the day "engaged in pursuits involving the performance of physical functions that are transferable to a work setting, a specific finding as to this fact may be sufficient to discredit a claimant's allegations." *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999) (citing *Fair*, 885 F.2d at 603). For example, a claimant's ability to cook, clean, and manage finances may be sufficient to support an adverse finding find of credibility. *See Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1175 (9th Cir. 2008). Notably, the Ninth Circuit determined that "[e]ven where those activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment." *Molina v. Astrue*, 674 F.3d 1104, 1113 (9th Cir. 2012) (citing *Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1225 (9th Cir. 2010); *Valentine*, 574 F.3d at 693)).

In this case, the ALJ considered Plaintiff's activities and noted she "described daily activities which [were] fairly limited," including watching television, taking care of "her personal care needs" and preparing meals. (Doc. 11-3 at 35) As a result, the ALJ did not find Plaintiff's activities supported an adverse credibility determination, but rather found they were "outweighed by the other factors." (*Id.*) Thus, the ALJ did not err when considering the level of activity alleged by Plaintiff. *See Lewis v.*

*Apfel*, 236 F.3d 503, 517 (9th Cir. 2001) (limited activities did not constitute convincing evidence that the claimant could function regularly in a work setting).

### 5.    Conclusion

For the reasons set forth above, the ALJ properly set forth findings "sufficiently specific to allow a reviewing court to conclude the ALJ rejected the claimant's testimony on permissible grounds." *Moisa v. Barnhart*, 367 F.3d 882, 885 (9th Cir. 2004); *see also Thomas*, 278 F.3d at 958. As such, any error with other factors identified by Plaintiff in the opening brief are harmless, because they "do[] not negate the validity of the ALJ's ultimate credibility conclusion." *Carmickle*, 533 F.3d at 1160 (quoting *Batson v. Comm'r of Soc. Sec. Admin*, 359 F.3d 1190, 1197 (9th Cir. 2004); *see also Bray*, 554 F.3d at 1227.

## B.    Lay Witness Testimony

The ALJ must consider statements of "non-medical sources" including spouses, parents, and persons in determining the severity of a claimant's symptoms. 20 C.F.R. § 404.1513(d)(4); *see also Stout v. Comm'r*, 454 F.3d 1050, 1053 (9th Cir. 2006) ("In determining whether a claimant is disabled, an ALJ must consider lay witness testimony concerning a claimant's ability to do work."). As a general rule, "lay witness testimony as to a claimant's symptoms or how an impairment affects ability to work is competent evidence, and therefore cannot be disregarded without comment." *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996) (emphasis and internal citations omitted). To discount the testimony of a lay witness, the ALJ must give specific, germane reasons for rejecting the opinion of the witness. *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993).

Here, the ALJ found the statements from Mr. Taylor lacked credibility. (Doc. 11-3 at 33)  To support this determination, the ALJ explained:

> His statements have not been given under oath.  Mr. Taylor did not report he was a medical professional, and therefore, as a lay witness, he is not competent to make a diagnosis or argue the severity of the claimant's symptoms in relationship to her ability to work.  Mr. Taylor noted that the two spend most of the day together lying around, shopping and sleeping.  Further, since they are married Mr. Taylor has a financial interest in the claimant receiving benefits.  Therefore, his opinion is not unbiased.  Most importantly, the clinical or diagnostic medical evidence that is discussed more thoroughly below does not support an inability to work due to a disabling condition.

(*Id.*)  Plaintiff contends these are not "specific reasons germane to Mr. Taylor," and the ALJ erred by

1   rejecting this testimony.  (Doc. 19 at 30; *see also* Doc. 19 at 27-30)

2          As an initial matter, this Court has previously determined that an ALJ may not reject lay

3   witness statements on the grounds that they were not made under oath.  *Bush v. Colvin*, 2015 U.S.

4   Dist. LEXIS 145762 at *10, n.2 (E.D. Cal. Oct. 26, 2015).   The Court explained,

> Social Security law does not require, or even suggest, that lay witness statements have to
> be made under oath. In fact, the form that the Social Security Administration provides to
> claimants for documenting lay witness statements, Form SSA 3380-BK, does not include
> an oath. It does not even require a signature. The form merely asks the witness to print
> his or her name at the end of the form.

8   *Id.*  Similarly, in *Miner v. Colvin*, the Court explained: "If an ALJ were permitted to summarily

9   discount any third-party statement written on such a form because the form does not require the third-

10  party to make his or her statement under oath, that would completely undermine the entire purpose of

11  such a form."  *Id.*, 2015 U.S. Dist. LEXIS 126045 at *25-25 (E.D. Cal. )

12         In addition, an ALJ may not reject lay witness testimony solely because the witness may have

13  "financial interest in seeing the claimant receive benefits."  The Ninth Circuit explained that an ALJ

14  may not rely on "characteristics common to all spouses," such as a financial interest, to discount a

15  spouse's testimony.  *See Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 694 (9th Cir. 2009).

16  Nevertheless, a lay witness's close relationship to a claimant and possible pecuniary interest in a

17  particular outcome, when coupled with inconsistent medical evidence, have been found to be germane

18  reasons. *See, e.g., Greger v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006).  Thus, because the ALJ also

19  found the statements of Mr. Taylor were also inconsistent with "the clinical or diagnostic medical

20  evidence," these are specific and germane reasons for rejecting his statements.

21         Further, the facts before the Court are similar to those in *Bayliss*, in which the plaintiff argued

22  the ALJ improperly rejected portions of lay witnesses' testimony.  *Bayliss v. Barnhart*, 427 F.3d 1211,

23  1211 (9th Cir. 2005).  The ALJ accepted testimony of a lay witness "that was consistent with the record

24  of [her] activities and the objective evidence in the record; he rejected portions of their testimony that

25  did not meet this standard."  *Id.*  The Ninth Circuit found "inconsistency with medical evidence is one

26  [germane] reason" to reject lay witness testimony.  *Id.*  Likewise, here, the ALJ found Plaintiff had

27  limited daily activities, which were supported by Mr. Taylor's statements.  However, the ALJ

28  determined the limitations assessed by Mr. Taylor were not supported by the medical record, and

1   rejected these portions of his statement.  (Doc. 11-3 at 33).

2          Similarly, in *Miner*, the ALJ articulated nearly identical reasons for rejecting the lay witness

3   testimony by concluding the statements were not given under oath, the witness was "not competent to

4   make a diagnosis or argue the severity of the claimant's symptoms in relationship to her ability to

5   work," she had "a financial interest in seeing the claimant receive benefits" and "the clinical or

6   diagnostic medical evidence … does not support her statements."  *Id.* at *23-24.  The Court found the

7   errors with the first three reasons were harmless because the ALJ also provided a valid reason for

8   rejecting the statement: the conflict with the medical record.  *Id.* (citing *Molina*, 674 F.3d at 1115).

9          Finally, as discussed above, the medical evidence supported the ALJ's adverse credibility

10  determination, and the reasoning applies equally well to the testimony of Mr. Taylor.  *See Molina*, 674

11  F.3d at 1117; *Valentine*, 574 F.3d at 694.  Accordingly, the ALJ carried his burden to identify specific,

12  germane reasons for discounting the lay witness testimony.  *See Greger*, 464 F.3d at 972.

13  **C.      The Residual Functional Capacity**

14         A claimant's residual functional capacity ("RFC") is "the most [a claimant] can still do despite

15  [his] limitations."  20 C.F.R. §§ 404.1545(a), 416.945(a); *see also* 20 C.F.R. Part 404, Subpart P,

16  Appendix 2, § 200.00(c) (defining an RFC as the "maximum degree to which the individual retains the

17  capacity for sustained performance of the physical-mental requirements of jobs").  In formulating a

18  RFC, the ALJ weighs medical and other source opinions, as well as the claimant's credibility.  *See, e.g.,*

19  *Bray*, 554 F.3d at 1226.  Further, the ALJ must consider "all of [a claimant's] medically determinable

20  impairments"—whether severe or not—when assessing a RFC.  20 C.F.R. §§ 405.1545(a)(2),

21  416.945(a)(2).

22         Plaintiff argues that "[t]he ALJ made several errors in the formulation of [her] Residual

23  Functional Capacity."  (Doc. 19 at 30)  According to Plaintiff, the RFC defined by the ALJ "does not

24  address [her] chest pain, []or the swelling in her feet which requires her to elevate her feet when her

25  Lasix does not work."  (*Id.*)  In addition, Plaintiff asserts the ALJ failed to include "the limitation

26  regarding [Plaintiff's] ability to stay on task as opined by Dr. Mohammed."  (*Id.*)  Finally, Plaintiff

27  argues the RFC is erroneous because the ALJ relied upon the testimony of Dr. Landau, who Plaintiff

28  contends "erroneously defined [Plaintiff's] heart function."  (*Id.*)

                                                    25

1    1.    Chest pain

2    According to Plaintiff, the ALJ erred by not addressing her chest pain in the RFC.  (Doc. 19 at

3    30, 31-32)  Plaintiff contends she was treated by Dr. Moon for congestive heart failure, chest pain,

4    chest pressure, shortness of breath, and wheezing.  (*Id.*)  In addition, she asserts that "Dr. Moon

5    prescribed medications for heart disease, congestive heart failure and high blood pressure."  (*Id.* at 32)

6    Plaintiff argues the ALJ failed "to provide clear and convincing reasons for rejecting the opinions and

7    assessments of Dr. Moon" in articulating the RFC.  (*Id.* at 32)

8    Notably, the ALJ reviewed the treatment notes and Plaintiff had "a history of coronary artery

9    disease," but there was "no objective basis for the … condition of claimed congestive heart failure."

10   (Doc. 11-3 at 30, 33)  In addition, the ALJ noted Plaintiff's "asserted chest pain does not have a cardiac

11   origin, according to the cardiologist medical expert, Dr. Landau."  (*Id.* at 30)  As a result, at step two of

12   the sequential evaluation, the ALJ concluded that "neither of these conditions are medically

13   determinable impairments."  (*Id.*)

14   Moreover, Dr. Moon did not offer any opinions regarding Plaintiff's reported impairments.

15   Although Plaintiff cites her treatment notes from 2010 to support her reports of chest pain, "[t]he mere

16   existence of an impairment is insufficient proof of a disability."  *Matthews v. Shalala*, 10 F.3d 678 (9th

17   Cir. 1993).  Indeed, Plaintiff testified when she last saw her cardiologist, she was told her heart "was

18   fine", and Dr. Landau "found no objective evidence of congestive heart failure."  (Doc. 11-3 at 56, 86)

19   Dr. Landau further opined there was no medical evidence that Plaintiff's chest pain was due to a

20   cardiac condition.  (*Id.* at 86)  Thus, Plaintiff fails to demonstrate that her chest pain was a "medically

21   determinable condition" that should have been addressed when the ALJ formulated the RFC.

22   2.    Swelling in her feet

23   Plaintiff contends the ALJ failed to address her "testimony that she experienced daily swelling

24   in her hands and feet [citation] which could occur any day of the week…despite taking Lasix."  (Doc.

25   19 at 33, internal citations omitted)  Plaintiff asserts she "testified that if the Lasix did not control the

26   swelling, which occurred as often as once a week, she elevates her feet to above heart level …for about

27   30 minutes… to reduce the swelling."  (*Id.*, internal citations omitted)

28   Significantly, as discussed above, the ALJ found Plaintiff lacked credibility regarding the

1   severity of her impairments.  Because there was no evidence that a physician required Plaintiff to

2   elevate her legs, the ALJ was not required to include this limitation in the RFC.[2]  *See Carmickle v.*

3   *Commissioner, Soc. Sec. Admin.*, 533 F.3d 1155, 1164-65 (9th Cir. 2008) (holding that if "the medical

4   record does not establish any work-related limitations as a result of [the] impairment" the ALJ is not

5   required to include it in the RFC); *Burch*, 400 F.3d at 684 (upholding the RFC assessment because the

6   claimant "has not set forth, and there is no evidence in the record, of any functional limitations as a

7   result of her [impairment] that the ALJ failed to consider").

8          3.       Ability to stay on task

9          Plaintiff contends, "The ALJ erred in not including any limitation regarding [her] ability to stay

10  on task when giving great weight to the opinions of Dr. Mohammed."  (Doc. 19 at 35)  According to

11  Plaintiff, "If the ALJ did not accept part of Dr. Mohammed's opinions, the ALJ has not provided any

12  legally sufficient reason to reject that portion of Dr. Mohammed's opinions."  (*Id.*)

13         Notably, Plaintiff mischaracterizes the testimony of Dr. Mohammed, who specifically opined

14  that Plaintiff had "mild limitations" with concentration, persistence, and pace.  (Doc. 11-3 at 97)  With

15  these limitations, Dr. Mohammed testified that Plaintiff was able to "do a task requiring simple

16  instructions and detailed [instructions] but not complex instructions."  (*Id.* at 98)  He also opined

17  Plaintiff should "probably" be limited to "low stress" work.  (*Id.*)  The ALJ gave "great weight" to the

18  opinions of Dr. Mohammed—completely adopting his findings in the RFC—by concluding that

19  Plaintiff "can perform the range of simple through detailed work but no complex work; frequent contact

20  with supervisors and co-workers but no more than occasional contact in person public contact; low

21  stress occupations, defined as one with few changes in the work or work setting."  (Doc. 11-3 at 32, 36)

22  Accordingly, contrary to Plaintiff's assertion, the ALJ did not reject Dr. Mohammed's opinions.[3]

23

24         [2] Moreover, even assuming the ALJ erred by failing to account for Plaintiff's need to elevate her legs "as often as
    once a week," Plaintiff fails to demonstrate that this error is harmful.  The VE testified Plaintiff's need to elevate her legs
25  would not preclude her from working the production jobs identified, because she could do so during a normal break.  (*See*
    Doc. 11-3 at 105)
26         [3] Significantly, the jobs identified by the VE were "unskilled." (Doc. 11-3 at 103)  The Ninth Circuit has
    determined a person with *moderate* difficulties with concentration, persistence, pace, and "several moderate limitations in
27  other mental areas" is able to perform unskilled work.  *See, e.g.*, *Thomas*, 278 F.3d at 953, 955; *Stubbs-Danielson v.
    Astrue*, 539 F.3d 1169 (9th Cir. 2008); *Sabin v. Astrue*, 337 Fed. App'x. 617, 620-21 (9th Cir. 2009).  Because Dr.
28  Mohammed opined Plaintiff had only *mild* difficulties with concentration, Plaintiff is unable to demonstrate that she lacks
    the mental ability to stay on task sufficiently to perform the unskilled jobs identified by the VE.

1       4.     Reliance upon Dr. Landau's opinion

2       Relying upon information that was obtained from a website, Plaintiff argues the Dr. Landau's

3 testimony as to the classification of Plaintiff's condition "is erroneous." (Doc. 19 at 33) However,

4 Plaintiff has failed to demonstrate the admissibility of this evidence.

5       Moreover, although Plaintiff contends the ALJ "erred in relying upon testimony from Dr.

6 Landau" regarding Plaintiff's heart grade and classifications, there is no evidence in the record that the

7 ALJ relied upon this portion of Dr. Landau's testimony. Rather, the ALJ gave "great weight" to the

8 opinion of Dr. Landau that Plaintiff had "restrictions in her exertional limitations." (Doc. 11-3 at 35,

9 85, 94) Specifically, Dr. Landau testified:

10          I would limit standing and walking to one hour out of eight, 15 to 20 minutes at a time.
And using a cane for distances greater than one block. ... There are no limitations to

11          sitting with normal breaks such as every two hours and she should have the provision to
stand and stretch as needed, which I estimate may [be] require[d] one to three minutes

12          an hour. Lifting and carrying are limited to 10 pounds frequently and occasionally. And
she can occasionally stoop and bend. She can climb stairs occasionally but she cannot

13          climb ladders, work at heights, or balance. And finally, she cannot squat, kneel, crawl,
run, or jump.

14

15 (*Id.* at 84-95) These limitations were adopted by the ALJ in the RFC. (*See id.* at 31-32).

16       5.     The RFC is supported by substantial evidence

17       An ALJ's determination must be "supported by substantial evidence in the record." *Lester*, 81

18 F.3d at 830. The term "substantial evidence" "describes a quality of evidence ... intended to indicate

19 that the evidence that is inconsistent with the opinion need not prove by a preponderance that the

20 opinion is wrong." SSR 96-2p, 1996 SSR LEXIS 9 at *8[4]. "It need only be such relevant evidence as a

21 reasonable mind would accept as adequate to support a conclusion that is contrary to the conclusion

22 expressed in the medical opinion." *Id.*

23       Here, the ALJ adopted the RFC assessments offered by Drs. Mohammed and Landau—which

24 were the *most* restrictive of all the opinions offered by physicians. The opinions of non-examining

25

26      [4] Social Security Rulings (SSR) are "final opinions and orders and statements of policy and interpretations" issued
by the Commissioner. 20 C.F.R. § 402.35(b)(1). Although they do not have the force of law, the Ninth Circuit gives the

27 Rulings deference "unless they are plainly erroneous or inconsistent with the Act or regulations." *Han v. Bowen*, 882 F.2d
1453, 1457 (9th Cir. 1989); *see also Avenetti v. Barnhart*, 456 F.3d 1122, 1124 (9th Cir. 2006) ("SSRs reflect the official

28 interpretation of the [SSA] and are entitled to 'some deference' as long as they are consistent with the Social Security Act
and regulations").

physicians "may constitute substantial evidence when . . . consistent with other independent evidence in the record." *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001); *Andrews v. Shalala*, 53 F.3d 1035, 1042 (9th Cir. 1995). Notably, Drs. McNairn and Dozier, who examined Plaintiff, opined she *did not* have disabling mental or physical impairments. (*See* Doc. 11-9 at 30-31, 48) Accordingly, the opinions of Dr. Mohammed and Landau are substantial evidence supporting the RFC.

**D.     Vocational Expert Testimony**

Plaintiff contends the ALJ erred by relying upon the testimony of the vocational expert to determine that she is able to perform work in the national economy at step five of the sequential evaluation. (Doc. 19 at 37-38) At step five, the Commissioner may establish there is work in "significant numbers" in the national economy a claimant can perform through the testimony of a vocational or application of the Medical-Vocational Guidelines. *See Osenbrock v. Apfel*, 240 F.3d 1157, 1162 (9th Cir. 2001). An ALJ may call a VE "to testify as to (1) what jobs the claimant, given his or her functional capacity, would be able to do; and (2) the availability of such jobs in the national economy." *Tackett v. Apfel*, 180 F.3d 1094, 1101 (9th Cir. 1999), 62 Soc. Sec. Rep. Service 607.

Here, because Plaintiff did not have the capacity to perform the full range of sedentary work under the Medical-Vocational Guidelines, the ALJ sought testimony from the VE "[t]o determine the extent to which [Plaintiff's] limitations erode the unskilled sedentary occupational base." (Doc. 11-3 at 38) This is consistent with Social Security Ruling ("SSR") 83-12, which requires an adjudicator to consult a vocational resource when "the extent of erosion of the occupational base is not clear." *Id.*

The ALJ must pose "hypothetical questions to the vocational expert that 'set out all of the claimant's impairments' for the vocational expert's consideration" when eliciting testimony. *Tackett*, 180 F.3d at 1101 (quoting *Gamer v. Sec'y of Health and Human Servs.*, 815 F.2d 1275, 1279 (9th Cir. 1987)). The description of impairments "must be accurate, detailed, and supported by the medical record." *Id.* Only limitations supported by substantial evidence must be included in the question. *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 886 (9th Cir. 2006); *Osenbrock*, 240 F.3d at 1163-65. "If the assumptions in the hypothetical are not supported by the record, the opinion of the vocational expert that the claimant has a residual working capacity has no evidentiary value." *Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984). When the "weight of the medical evidence supports the

1  hypothetical questions posed by the ALJ," the ALJ's findings will be upheld by the court.  *Martinez v.*
2  *Heckler*, 807 F.2d 771, 774 (9th Cir. 1987); *see also Gallant*, 753 F.2d at 1456.

3       As discussed above, Plaintiff fails to show the ALJ erred in his assessment of the RFC, which
4  was supported by substantial evidence in the record.  Each of the limitations in the RFC where
5  identified the hypothetical question posed to the vocational expert.  (*Compare* Doc. 11-3 at 32 *with*
6  Doc. 11-3 at 101)  Thus, the VE's testimony—that an individual with the same limitations as Plaintiff is
7  able to perform work in the national economy including work as an order clerk, nut sorter, and
8  assembler— is substantial evidence in support of the ALJ's decision that Plaintiff is not disabled.  *See*
9  *Tackett*, 180 F.3d at 1101.

10  ## CONCLUSION AND ORDER

11       For the reasons set forth above, the ALJ applied the proper legal standards and his decision is
12  supported by substantial evidence in the record.  Consequently, the ALJ's determination that Plaintiff is
13  not disabled must be upheld by the Court.  *Sanchez*, 812 F.2d at 510.

14       Based upon the foregoing, **IT IS HEREBY ORDERED**:

15       1.     The decision of the Commissioner of Social Security is **AFFIRMED**; and

16       2.     The Clerk of Court **IS DIRECTED** to enter judgment in favor of Defendant Carolyn W.
17       Colvin, Acting Commissioner of Social Security, and against Plaintiff April Taylor.

18  IT IS SO ORDERED.
19

20  Dated:  __February 22, 2016__          _____/s/ Jennifer L. Thurston_____
21                    UNITED STATES MAGISTRATE JUDGE
22
23
24
25
26
27
28